Slip Op. 18-121

**UNITED STATES COURT OF INTERNATIONAL TRADE**

| | |
|---|---|
| ARCELORMITTAL USA LLC, | |
| Plaintiff, | |
| and | |
| AK STEEL CORPORATION, NUCOR CORPORATION, AND UNITED STATES STEEL CORPORATION, | |
| Plaintiff-Intervenors, | |
| NOVOLIPETSK STEEL PUBLIC JOINT STOCK COMPANY, | Before: Gary S. Katzmann, Judge Consol. Court No. 16-00168 |
| Consolidated Plaintiff, | |
| v. | |
| UNITED STATES, | |
| Defendant, | |
| and | |
| PAO SEVERSTAL AND SEVERSTAL EXPORT GMBH, | |
| Defendant-Intervenors. | |

**<u>OPINION</u>**

[Commerce's <u>Final Determination</u> is remanded for further explanation as appropriate.]

Dated: September 19, 2018

<u>John M. Herrmann, II</u>, and <u>Brooke Ringel</u>, Kelly Drye & Warren, LLP, of Washington, DC, argued for plaintiff. With them on the joint brief were <u>Alan J. Price</u>, <u>Timothy C. Brightbill</u>, and <u>Christopher B. Weld</u>, Wiley Rein LLP, of Washington, DC, for plaintiff-intervenor, *Nucor Corporation*; <u>Thomas M. Beline</u>, Cassidy Levy Kent, LLP, of Washington, DC, for plaintiff-

intervenor, *United States Steel Corporation,* and on the brief were <u>Jeffrey D. Gerrish</u> and <u>Luke A. Meisner</u>, of Skadden, Arps, Slate, Meagher & Flom LLP, of Washington, DC; and <u>Daniel L. Schneiderman</u> and <u>Stephen A. Jones</u>, King & Spalding LLP, of Washington, DC, for plaintiff-intervenor, *AK Steel Corporation*.

<u>Matthew P. McCullough</u>, <u>Marat S. Umerov</u>, and <u>Tung A. Nguyen</u>, Curtis, Mallet-Prevost, Colt & Mosle LLP, of Washington, DC, argued for consolidated plaintiff.  With them on the brief were <u>William H. Barringer</u> and <u>Valerie S. Ellis</u>.

<u>Patricia M. McCarthy</u>, Assistant Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, argued for defendant.  With her on the brief were <u>Chad A. Readler</u>, Principal Deputy Assistant Attorney General, <u>Jeanne E. Davidson</u>, Director, and <u>Renee A. Burbank</u>, Trial Attorney.  Of counsel on the brief was <u>Michael T. Gagain</u>, Senior Attorney, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce, of Washington, DC.

<u>Daniel J. Cannistra</u>, Crowell & Moring LLP, of Washington, DC, argued for defendant-intervenors.

Katzmann, Judge:  The complex litigation that unfolds in the United States Court of International Trade is typically populated by multiple parties and agencies, shifting alignments, and intersecting claims and issues.   Its resolution often calls for diagramming on a blackboard with multi-colored chalk.   The case now before this Court may be viewed in such context.

Plaintiffs in two separate cases -- ArcelorMittal USA LLC ("ArcelorMittal") in one case, and Novolipetsk Steel Public Joint Stock Company ("NLMK") in the other -- challenged different elements of the United States Department of Commerce's ("Commerce") final affirmative determination of its <u>Countervailing Duty Investigation of Certain Cold-Rolled Steel Flat Products From the Russian Federation</u>, 81 Fed. Reg. 49,935 (Dep't Commerce July 29, 2016) ("<u>Final Determination</u>") and the accompanying July 20, 2016 Issues and Decision Memorandum, C–821–823 ("<u>IDM</u>").  The United States ("the Government"), on behalf of Commerce, was the defendant in both cases.  Domestic steel manufacturers AK Steel Corporation, Nucor Corporation, and United States Steel Corporation joined ArcelorMittal's case as plaintiff-intervenors and supported its arguments; all four companies joined NLMK's case as defendant-intervenors and supported the

Government's position with respect to the elements of the <u>Final Determination</u> that NLMK contested. In addition, PAO Severstal and its wholly-owned affiliate, Severstal Export GMBH (collectively, "Severstal") joined ArcelorMittal's case as defendant-intervenor and supported the Government's position with respect to the elements of the <u>Final Determination</u> that ArcelorMittal contested. The Court, upon motion by the parties, consolidated the two cases into the case currently before the Court.

In essence, this case requires the Court to assess the countervailing duty ("CVD") rates selected, as well as the invocation and application of adverse facts available ("AFA"), by Commerce in its <u>Final Determination</u>. Commerce applied AFA in determining CVD rates for both company respondents to the CVD investigation, Severstal and NLMK. Plaintiff ArcelorMittal contests the CVD rate Commerce applied to respondent and defendant-intervenor Severstal, while consolidated plaintiff NLMK contests the CVD rate Commerce applied to it.

The primary question posed with respect to Severstal's CVD rate is whether Commerce erred in its selection of a program-specific AFA rate for Severstal's unreported use of the tax deduction program for mining-exploration expenses.

The following questions are posed with respect to NLMK's CVD rate: (1) Was Commerce's determination -- that the Government of Russia's ("the GOR") alleged provision of natural gas for less than adequate remuneration ("LTAR") was *de facto* specific to steel manufacturing -- supported by substantial evidence and in accordance with law? (2) Were Commerce's benefit and benchmark determinations supported by substantial evidence and in accordance with law?

# BACKGROUND

## A.    Countervailable Subsidies Generally.

If Commerce determines that the government of a country is providing, directly or indirectly, a countervailable subsidy with respect to the manufacture, production, or export of a class or kind of merchandise imported, or sold, or likely to be sold for import, into the United States, and the International Trade Commission determines that an industry in the United States is materially injured or threatened with material injury thereby, then Commerce shall impose a countervailing duty upon such merchandise equal to the amount of the net countervailable subsidy. See Section 701 of the Tariff Act of 1930, as amended, 19 U.S.C. § 1671(a) (2012).[1]  An investigation of countervailable subsidies shall commence whenever an interested party files a petition with Commerce, on behalf of an industry,[2] which alleges the elements necessary for the imposition of the duty, and which is accompanied by information reasonably available to the petitioner supporting those allegations.  19 U.S.C. § 1671a(b)(1), (c)(2).

Generally, a subsidy is countervailable if it consists of a foreign government's financial contribution to a recipient, which is specific, and also confers a benefit upon the recipient, as defined under 19 U.S.C. § 1677(5).  A benefit is conferred when, in the case where goods or

---

[1] Further citations to the Tariff Act of 1930, as amended, are to the relevant provision of Title 19 of the U.S. Code, 2012 edition.  Citations to 19 U.S.C. § 1677e, however, are not to the U.S. Code 2012 edition, but to the unofficial U.S. Code Annotated 2018 edition.  The current U.S.C.A. reflects the amendments made to 19 U.S.C. § 1677e (2012) by the Trade Preferences Extension Act of 2015, Pub. L. No. 114–27, § 502, 129 Stat. 362, 383–84 (2015).  The TPEA amendments are applicable to all determinations made on or after August 6, 2015, and therefore, are applicable to this proceeding.  See Dates of Application of Amendments to the Antidumping and Countervailing Duty Laws Made by the Trade Preferences Extension Act of 2015, 80 Fed. Reg. 46,793, 46,794 (Dep't Commerce Aug. 6, 2015).

[2] "The term 'industry' means the producers as a whole of a domestic like product, or those producers whose collective output of a domestic like product constitutes a major proportion of the total domestic production of the product."  19 U.S.C. § 1677(4)(A).

services are provided, such goods or services are provided for less than adequate remuneration.

19 U.S.C. § 1677(5)(E)(iv).  Furthermore, the statute states that:

> [T]he adequacy of remuneration shall be determined in relation to prevailing market conditions for the good or service being provided or the goods being purchased in the country which is subject to the investigation or review.  Prevailing market conditions include price, quality, availability, marketability, transportation, and other conditions of purchase or sale.

Id.  The regulation on "adequate remuneration" provides a multi-tiered analysis under which

Commerce may determine a suitable benchmark for the purposes of determining the existence and

amount of a benefit conferred.  Under Tier One, 19 C.F.R. § 351.511(a)(2)(i), Commerce assesses

market prices from actual transactions within the country under investigation; under Tier Two, id.

§ 351.511(a)(2)(ii), Commerce assesses world market prices that would be available to purchasers

in the country under investigation; and under Tier Three, id. § 351.511(a)(2)(iii), Commerce

assesses whether the government price is consistent with market principles.  See IDM at 16.

The subsidy must also be "specific," either in law or fact, as defined under 19 U.S.C. §

1677(5A).  As relevant to this case, a subsidy may be *de facto* specific when "[a]n enterprise or

industry is a predominant user of the subsidy."  19 U.S.C. § 1677(5A)(D)(iii)(II).

**B.     Adverse Facts Available.**

During the course of its CVD proceeding, Commerce requires information from both the

producer respondent and the foreign government alleged to have provided the subsidy.  See Fine

Furniture (Shanghai) Ltd. v. United States, 748 F.3d 1365, 1369–70 (Fed. Cir. 2014).  Information

submitted to Commerce during an investigation is subject to verification.  19 U.S.C. § 1677m(i)(1).

When a respondent: (1) withholds information that has been requested by Commerce, (2)

fails to provide such information by Commerce's deadlines for submission of the information or

in the form and manner requested, (3) significantly impedes an antidumping proceeding, or (4)

provides information that cannot be verified, then Commerce shall "use the facts otherwise available in reaching the applicable determination."  19 U.S.C. § 1677e(a)(2).  This subsection thus asks whether necessary or requested information is missing from the administrative record, and provides Commerce with a methodology to fill the resultant informational gaps.  See Nippon Steel Corp. v. United States, 337 F.3d 1373, 1381 (Fed. Cir. 2003).

Under certain circumstances, in an investigation, Commerce may assign an AFA rate to an investigated respondent as to a given subsidy program, instead of the countervailable subsidy rate that the respondent might receive for that program under normal circumstances.  Specifically, Commerce "may use an inference that is adverse to the interests of that party in selecting from among the facts otherwise available" if it "finds that an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information[.]"  19 U.S.C. § 1677e(b)(1)(A).  A respondent's failure to cooperate to "the best of its ability" is "determined by assessing whether [it] has put forth its maximum effort to provide Commerce with full and complete answers to all inquiries."  Nippon Steel, 337 F.3d at 1382; see Özdemir Boru San. ve Tic. Ltd. Sti. v. United States, 41 CIT ___, ___, 273 F. Supp. 3d 1225, 1231, 1241–42 (2017).

When applying an adverse inference, Commerce may rely on information from the petition, a final determination in the investigation, a previous administrative review, or any other information placed on the record.  19 U.S.C. § 1677e(b)(2); 19 C.F.R. § 351.308(c).  Notably, if Commerce uses an adverse inference under § 1677e(b)(1)(A) in selecting among facts otherwise available, Commerce is not required to demonstrate that the dumping margin used "reflects an alleged commercial reality of the interested party."  19 U.S.C. § 1677e(d)(3); see Hyundai Steel Co. v. United States, 41 CIT ___, ___, 279 F. Supp. 3d 1349, 1355–56 (2017).

Typically, an AFA rate is higher than the normally calculable subsidy rate for an investigated program, and thus ultimately results in a higher CVD rate.  See 19 U.S.C. § 1677e. Commerce maintains that its practice ensures "that the party does not obtain a more favorable result by failing to cooperate than if it had cooperated fully."  Özdemir, 273 F. Supp. 3d at 1233 (quoting Statement of Administrative Action, accompanying the Uruguay Round Agreements Act, H.R. No. 103–316, vol. 1, at 870 (1994), reprinted in 1994 U.S.C.C.A.N. at 4199 ("SAA")).[3] Commerce's practice when selecting an adverse rate from among the possible sources of information is also intended to ensure that the applied rate is sufficiently adverse to the respondent so as to deter future noncompliance.[4]   See id. at 1245.

Commerce has developed a hierarchy when selecting the subsidy rate to be applied pursuant to AFA.  IDM at 14–15, 126.  Specifically, in the first step of the CVD AFA hierarchy -- the step applied, and primarily at issue, in this case -- Commerce examines whether, "in the context of the instant investigation, there is a calculated program subsidy rate for the identical program at issue.  If so, [Commerce] will use the calculated program rate for that particular program as the basis of the AFA rate."  Id. at 15.  If there is no identical program match within the

---

[3] See 19 U.S.C. § 3512(d), which states in relevant part that "[t]he statement of administrative action . . . shall be regarded as an authoritative expression by the United States concerning the interpretation and application of the Uruguay Round Agreements and this Act in any judicial proceeding in which a question arises concerning such interpretation or application."  See also RHP Bearings Ltd. v. United States, 288 F.3d 1334, 1346 n.7 (Fed. Cir. 2002).

[4] The relevant statutory provision covering application of adverse inferences addresses both countervailing duty cases and antidumping cases in tandem.  See generally 19 U.S.C. § 1677e. Federal Circuit case precedent too demonstrates that the statute's underlying purposes are equally applicable to countervailing duty cases.  See Fine Furniture, 748 F.3d at 1372–73 (applying statutory purpose of ensuring uncooperative party does not benefit from its non-cooperation in countervailing duty case); KYD, Inc. v. United States, 607 F.3d 760, 768 (Fed. Cir. 2010) (applying statutory purpose of deterrence in countervailing duty case).

investigation, or if the rate is zero, then Commerce in the second step of the hierarchy applies the

highest non-*de minimis* rate calculated for the same program in another CVD investigation

involving the same country.  If there is none, then in the third step Commerce uses the highest non-

*de minimis* rate calculated for a similar program in another CVD investigation involving the same

country.  If that step also does not produce an applicable AFA rate, then Commerce in the fourth

step  uses the highest calculated subsidy rate for any program otherwise identified in a CVD case

involving the same country that could conceivably be used by the non-cooperating companies.

See Özdemir, 273 F. Supp. 3d at 1232 (discussing Commerce's AFA hierarchy); Essar Steel. Ltd.

v. United States, 753 F.3d 1368, 1371–74 (Fed. Cir. 2014); see, e.g., Welded Line Pipe from The

Republic of Turkey, 80 Fed. Reg. 61,371 (Dep't of Commerce Oct. 13, 2015) (final affirm. CVD

determ.), and accompanying Issues & Decision Memorandum at 4–7.

## C.    Factual and Procedural Background.

On August 17, 2015, in response to a petition from petitioners,[5] Commerce initiated a CVD

investigation concerning various subsidy programs that allegedly benefitted Russian cold-rolled

steel producers.  Certain Cold-Rolled Steel Flat Products From Brazil, India, the People's Republic

of China, the Republic of Korea, and Russia, 80 Fed. Reg. 51,206, 51,210 (Dep't Commerce Aug.

24, 2015) (initiation notice), P.R. 49.  These programs included the deduction of research and

development ("R&D") and exploration costs from taxable income, and the reduction in extraction

taxes.  See Commerce's Initiation Checklist at 11–12, P.R. 44 (Aug. 19, 2015).  Commerce also

investigated whether the cold-rolled steel producers were provided natural gas for less than

adequate remuneration.  Id. at 12–14.

---

[5] Petitioners include plaintiff ArcelorMittal and plaintiff-intervenors AK Steel Corporation, Nucor
Corporation, and United States Steel Corporation.

On September 14, 2015, Commerce selected Severstal Export GMBH and Novex Trading

(Swiss) SA (Novex) as mandatory respondents.[6]   Respondent Selection Memorandum at 5, P.R.

71 (Sept. 14, 2015); 19 U.S.C. § 1677f-1(e)(2)(A)(i); 19 C.F.R. 351.204(c)(2).   Commerce then

issued initial and supplemental questionnaires to the GOR and both respondents. See Commerce's

Letter to Ministry of Economic Development of the Russian Federation Re: Countervailing Duty

Investigation of Certain Cold-Rolled Steel Flat Products from the Russian Federation:

Countervailing Duty Questionnaire, P.R. 72, (Sept. 14, 2015) ("GOR CVD Questionnaire").

NLMK provided responses on behalf of its wholly-owned affiliate, Novex, as well as several other

companies that Commerce determined were cross-owned under 19 C.F.R. § 351.525(b)(6).[7]   IDM

at 9–10.   Severstal provided responses on behalf of its wholly-owned affiliate, Severstal Export

GMBH, and other companies which Commerce treated as cross-owned.   IDM at 10.

---

[6] In countervailing duty investigations, Commerce may select mandatory respondents pursuant to
19 U.S.C. § 1677f-1(e)(2), which provides:

> If [Commerce] determines that it is not practicable to determine individual
> countervailable subsidy rates [in investigations or administrative reviews] because
> of the large number of exporters or producers involved in the investigation or
> review, [Commerce] may--
>
>> (A) determine individual countervailable subsidy rates for a reasonable
>> number of exporters or producers by limiting its examination to--
>>
>>> (i) a sample of exporters or producers that the administering
>>> authority determines is statistically valid based on the information
>>> available to the administering authority at the time of selection[.]

[7] 19 C.F.R. § 351.525(b)(6)(vi) states, in relevant part, "[c]ross-ownership exists between two or
more corporations where one corporation can use or direct the individual assets of the other
corporation(s) in essentially the same ways it can use its own assets.   Normally, this standard will
be met where there is a majority voting ownership interest between two corporations or through
common ownership of two (or more) corporations."

The GOR CVD Questionnaire requested information regarding whether the two mandatory respondents, NLMK and Severstal, received countervailable subsides in the form of the provision of natural gas for LTAR by Public Joint Stock Company Gazprom ("Gazprom"), a Russian government authority, during the period of investigation ("POI").  See GOR CVD Questionnaire at Section II at 4–7.  The questionnaire also requested that the GOR "[e]xplain in detail how natural gas rates are set in Russia and provide copies of all laws, regulations and pricing guidelines that govern the setting of the rates."  Id. at 6.  The GOR responded that it does not maintain statistics on industries that purchase natural gas or the amount of natural gas purchased by the metallurgical industry, of which both mandatory respondents are a part.  GOR's Initial Questionnaire Resp. at 29, P.R. 133–41, C.R. 138–46, (Oct. 27, 2015).

In its supplemental questionnaire to the GOR, Commerce asked the GOR to suggest an alternate source of data that could be used to evaluate natural gas purchases in the domestic market during the POI.  Commerce's Letter to Ministry of Economic Development of the Russian Federation Re: Countervailing Duty Investigation of Certain Cold-Rolled Steel Flat Products from the Russian Federation: Countervailing Duty Supplemental Questionnaire at 4–7, P.R. 186, (Nov. 12, 2015). In its response, the GOR identified Gazprom's annual reports, which had been placed on the record as part of the GOR's initial questionnaire response, as a potential source of the requested information.  GOR's Suppl. Questionnaire Resp. at 7, P.R. 239–62, C.R. 220–43, (Nov. 19, 2015).

In Severstal's response to Commerce's Initial Questionnaire, it addressed Commerce's questions regarding the tax deduction of mining-related R&D and exploration costs by providing information concerning the tax deduction of R&D expenses, but responded that "Severstal did not receive any benefits under the tax deduction for exploration costs."    Severstal's Initial

Questionnaire Resp. at 17–21, 23–26, P.R. 145–52, C.R. 147–75, (Oct. 27, 2015) ("Severstal's

IQR"). Commerce subsequently issued a supplemental questionnaire to Severstal requesting

additional information and clarification regarding Severstal's response to the Initial Questionnaire.

See Letter to Crowell & Moring LLP Re: Countervailing Duty Investigation of Cold-Rolled Steel

Flat Products from the Russian Federation, P.R. 225, C.R. 214, (Nov. 17, 2015) ("Supplemental

Questionnaire"). In its response to the Supplemental Questionnaire, Severstal did not respond to

Commerce's questions about the deduction of mining-related exploration expenses. See

Severstal's Suppl. Questionnaire Resp. at S-11-5-13, P.R. 269–309, C.R. 253–300, (Nov. 25,

2015) ("Severstal's Suppl. QR").

On December 22, 2015, Commerce issued its preliminary determination. See Certain

Cold-Rolled Steel Flat Products From the Russian Federation, 80 Fed. Reg. 79,564 (Dep't

Commerce Dec. 22, 2015) ("Preliminary Determination"), P.R. 369, and accompanying

Preliminary Decision Memorandum, P.R. 364, (Dec. 16, 2015) ("PDM"). Commerce found, with

respect to the provision of natural gas for LTAR, that: (1) Gazprom is a government authority

providing a financial contribution in the form of the provision of natural gas; (2) the provision of

natural gas is specific to cold-rolled steel producers in Russia; (3) the Russian natural gas market

is distorted by Gazprom's presence; and (4) "Tier Two" prices from certain European and Asian

export markets were appropriate benchmarks for measuring the benefit of the program to the

mandatory respondents. See PDM at 13–19; see also 19 C.F.R. § 351.511(a)(2)(ii). Furthermore,

Commerce determined that the GOR tax deduction program for exploration expenses (1) provided

a financial contribution to companies by allowing them to forego tax payments that would

otherwise be due to the government, pursuant to 19 U.S.C. § 1677(5)(D)(ii), PDM at 21; and (2)

was *de facto* specific under 19 U.S.C. § 1677(5A)(D)(iii)(I). Commerce preliminarily calculated

overall subsidy rates of 6.33 percent for NLMK and a *de minimis* 0.01 for Severstal.  Preliminary

Determination, 70 Fed. Reg. at 79,565.  However, in its Final Determination, Commerce explained

that it had inadvertently relied on the incorrect data for Severstal in performing this calculation

and instead clarified its understanding that Severstal had claimed non-use of the program.  See

IDM at 122–23; Ministerial Error Memorandum at 4, P.R. 534, (Aug. 16, 2016).

Following its Preliminary Determination, Commerce verified the facts placed on the record

by mandatory respondents and the GOR.  Commerce provided the GOR with its outline for

verification on February 29, 2016.  See Verification of the Questionnaire Responses Submitted

by the GOR for the Provision of Natural Gas for LTAR ("GOR Verification Outline"), P.R. 39

(Feb. 29, 2016).  Both in its verification instructions to the GOR and at verification, Commerce

officials "asked the Gazprom representatives to provide data to support the composition of

domestic sales reported in the company's annual reports for 2012, 2013, and 2014."  GOR

Verification Report at 7, P.R. 471, C.R. 426 (May 16, 2016); see GOR Verification Outline at

5.  Specifically, Commerce requested that the GOR be prepared to provide "supporting records

(such as, print-outs from Gazprom's database or sales reports) which were used to build-up the

annual sales data and to compute the percentages reported" in Gazprom's 2014 annual report.

GOR Verification Report at 4.  Gazprom did not allow Commerce personnel to review the

specific data contained in the company's quarterly sales reports for 2012, 2013, and 2014,

claiming that "the forms are confidential and cannot be examined."  See id. at 7.  Instead, Gazprom

provided Commerce with, inter alia, a blank copy of an internal form that the sales departments

within Gazprom purportedly complete on a quarterly basis.  See id.

During verification of Severstal, Commerce found that there were "previously unreported

deductions" due to Severstal's use of the exploration expense tax deduction program.  IDM at 124.

Commerce learned during the GOR's verification -- which preceded Severstal's verification -- that "line 040" of a Russian income tax return is where companies report their "indirect expenses," which include "expenses for exploration activities and R&D." IDM at 123 (citing GOR Verification Report at 8) (emphasis in original). Based on this information, Commerce requested Severstal provide a breakout and sub-breakout of line 040 of its tax return, which revealed that the sub-breakout contained exploration related accounts, the amount of which did not link to any deduction amounts that Severstal had previously reported to Commerce. Id. Commerce declined to collect the specific line 040 breakout and sub-breakout amounts "because they would have constituted untimely new factual information." Id. at 123–24. Consequently, the specific amounts within line 040 of Severstal's tax returns corresponding to exploration expenses are not on the record.

On July 29, 2016 Commerce issued its Final Determination. Commerce continued to find that Gazprom's provision of natural gas to NLMK Companies was *de facto* specific under 19 U.S.C. § 1677(5A)(D)(iii)(II), on the basis that the metallurgy sector is the predominant user of natural gas provided by Gazprom for LTAR. Commerce made this *de facto* specificity determination by applying AFA due to the GOR's refusal to place on the record the specific information -- supporting records such as sales reports -- requested by agency officials. See IDM at 48–50.

In regards to the appropriate benchmark to be used in calculating benefits under the provision of natural gas for LTAR program, Commerce continued to find that it could not use a Tier One benchmark as a result of the domestic Russian natural gas market being distorted. See id. at 52–56; see also 19 C.F.R. § 351.511(a)(2)(ii). However, diverging from its Preliminary Determination, Commerce determined that it would rely on a Tier Three benchmark consisting

of world market prices -- specifically, regional European prices -- to measure the adequacy of

remuneration for the natural gas that Gazprom sold to the NLMK Companies during the POI.

See IDM at 66–67.  Commerce found that Gazprom's prices were not market based, and that as

a result Commerce could not "conclude that the government natural gas prices are reflective of

market principles."  Id. at 69.  Because the government natural gas prices in Russia are not set in

accordance with market principles, pursuant to the agency's regulations and practice, Commerce

looked for "an approximate proxy to determine a market-based natural gas benchmark."  Id.

Commerce concluded that regional European natural gas pricing was the appropriate Tier Three

benchmark price, as Russia is part of the European gas market, the two markets are interconnected,

and "regional European prices are market-determined in the regional market to which Russia

belongs."  Id. at 70.  Commerce calculated an overall subsidy rate of 6.95 percent *ad valorem*

for NLMK Companies, based on countervailable subsidy program usage rates of 6.92 and 0.03

percent *ad valorem* for the provision of natural gas for LTAR and tax deduction for exploration

expenses subsidy programs, respectively.

   With respect to Severstal, Commerce applied AFA to determine the benefit the respondent

received from the tax deduction for exploration expenses program.  Id. at 124.  The program-

specific AFA rate that Commerce selected for Severstal in connection with the tax deduction for

exploration expenses was based on the subsidy rate that Commerce calculated for NLMK in

connection with NLMK's use of the same program.  See id. at 126.  To determine this AFA rate,

Commerce relied on the first step of its AFA hierarchy for investigations, described supra, in which

it "examines whether, in the context of the instant investigation, there is a calculated program

subsidy rate for the identical program at issue," and, if so, uses "the calculated program rate for

that particular program as the basis of the AFA rate."  Id. at 14, 126.  Commerce calculated an

overall subsidy rate for the Severstal Companies of 0.62 percent *ad valorem*, based on the sum of the Severstal Companies' usage rates of the Reduction in Extraction Taxes and the Provision of Mining Rights for LTAR programs of 0.02 percent and 0.57 percent *ad valorem*, respectively.  See id. at 23, 31.  Because 0.62 percent is *de minimis*, the Severstal entries would not be subject to a CVD order concerning cold-rolled steel from Russia.  See Final Determination, 81 Fed. Reg. at 49,936; see also 19 U.S.C. § 1671d(a)(3) ("In making a determination under this subsection, [Commerce] shall disregard any countervailable subsidy rate that is *de minimis*[.]"); 19 U.S.C. § 1671b(b)(4).

ArcelorMittal initiated this action challenging Commerce's Final Determination on August 25, 2016.  Summ., ECF No. 1.  ArcelorMittal filed its complaint on September 23, 2016.  ECF No. 8.  Severstal filed a Consent Motion to Intervene as Defendant-Intervenor on October 3, 2016.  ECF No. 10.  The Court granted that motion on October 3, 2016.  ECF No. 14.[8]

On October 14, 2016, Severstal filed a cross-claim against the United States.  Case No. 16-00219, ECF No. 20.  The Government filed a motion to sever and dismiss Severstal's cross-claim on December 2, 2016, primarily arguing that Severstal had no standing to file a cross-claim.  Case No. 16-00219, ECF No. 35.  The Court granted Defendant's motion to dismiss, and Defendant-Intervenor's cross-claim was dismissed without prejudice on April 25, 2017.  ArcelorMittal USA LLC v. United States, 41 CIT ___, 222 F. Supp. 3d 1293 (2017).

---

[8] AK Steel Corporation moved to intervene as plaintiff-intervenor on October 7, 2016.  ECF No. 22.  The Court granted that motion on October 17, 2016.  ECF No. 21.  Nucor Corporation moved to intervene as plaintiff-intervenor on October 18, 2016.  ECF No. 16. The Court granted that motion on October 19, 2016.  ECF No. 26.  U.S. Steel Corporation moved to intervene as plaintiff-intervenor on October 24, 2016.  ECF No. 27.  The Court granted that motion on October 27, 2016.  ECF No. 31.

NLMK initiated an action challenging Commerce's Final Determination on October 17,

2016.  Case No. 16-00219, ECF No. 1; NLMK filed its complaint on November 17, 2016.  Case

No. 16-00219, ECF No. 10.[9]

The Court ordered Case Nos. 16-00168 and 16-00219 to be consolidated under the lead

caption ArcelorMittal USA LLC v. United States, Consol. Case No. 16-00168, on May 10, 2017.

ECF No. 62.  Plaintiffs ArcelorMittal et al. and NLMK each filed motions for judgment on the

agency record pursuant to USCIT Rule 56.2, as well as memoranda of points and authorities

supporting these motions, on August 18, 2017.  ArcelorMittal Br., ECF Nos. 65–66; NLMK Br.,

ECF Nos. 67–68.  ArcelorMittal filed a response in opposition to NLMK's motion for judgment

on the agency record as defendant-intervenor on November 17, 2017.  ECF No. 74.  Severstal also

filed a response in opposition to ArcelorMittal's motion for judgment on the agency record as

defendant-intervenor on that same day.  ECF Nos. 75–76.  The Government filed its response in

opposition to both ArcelorMittal's and NLMK's motions for judgment on the agency record on

November 17, 2017.  Government Br., ECF Nos. 77–78.

The Government filed a motion to strike part of defendant-intervenor Severstal's Rule 56.2

response brief on December 1, 2017, arguing that much of the Severstal's brief advances

arguments that are not a response to ArcelorMittal's motion, but in fact an improper attempt to

advance the arguments contained in Severstal's dismissed cross-claim.  ECF No. 79.  Severstal

---

[9] AK Steel Corporation moved to intervene a plaintiff-intervenor on December 5, 2016.  Case No.
16-00219, ECF No. 12.  The court granted that motion the next day.  Case No. 16-00219, ECF No.
16.  Nucor Corporation moved to intervene as plaintiff-intervenor on December 13, 2016.  Case
No. 16-00219, ECF No. 17.  ArcelorMittal moved to intervene as plaintiff-intervenor the next day
Case No. 16-00219, ECF No. 21.  The court granted both those motions on December 16, 2016.
Case No. 16-00219, ECF Nos. 27–28.  U.S. Steel Corporation also moved to intervene as plaintiff-
intervenors on December 16, 2016.  Case No. 16-00219, ECF No. 29.  The Court granted that
motion on December 20, 2016.  Case No. 16-00219, ECF No. 33.

then filed a response in opposition to the Government's motion to strike on December, 20 2017.

ECF No. 82.  The next day, the Court issued an order denying without prejudice the motion to

strike, and further ordered that the parties may move for reconsideration of the motion to strike

following further discussion of these matters at oral argument.   ECF No. 83.   NLMK and

ArcelorMittal et. al. filed reply briefs on January 16, 2018 and January 17, 2018 respectively.  ECF

Nos. 85–86.

## JURISDICTION AND STANDARD OF REVIEW

The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1581(c) and 19 U.S.C.

§ 1516a(a)(2)(A)(i)(I) and (a)(2)(B)(ii).   The standard of review in this action is set forth in 19

U.S.C.  §  1516a(b)(l)(B)(i):  "[t]he  court  shall  hold  unlawful  any  determination,  finding  or

conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in

accordance with law[.]"

## DISCUSSION

**I.**     **Commerce Did Not Sufficiently Explain Its Selection Of A Program-Specific AFA Rate For Severstal's Unreported Use Of The Tax Deduction Program For Mining-Exploration Expenses.**

As detailed above, in its Final Determination, Commerce applied NLMK's rate for the

program to Severstal as its AFA rate under step one of Commerce's AFA hierarchy.  See IDM at

126.  ArcelorMittal argues that Commerce's decision was not in accordance with law because

Commerce did not adequately explain why it relied on step one of its AFA hierarchy and did not

use other alternatives in establishing Severstal's AFA rate.  ArcelorMittal Br. at 26.  Specifically,

Commerce did not explain its reason for resorting to the AFA hierarchy, or evaluate the remaining

steps in the hierarchy beyond step one.  Id. at 27.  In doing so, ArcelorMittal argues, Commerce

deprived the Court of the material needed to "conduct meaningful judicial review" of Commerce's

decision as is required under the law.  Id. at 26; see Altx, Inc. v. United States, 25 CIT 1100, 1104,

167 F. Supp. 2d 1353, 1361 (2001) ("[I]n order to ascertain whether [agency] action is arbitrary,

or otherwise not in accordance with law, reasons for the choices made among various acceptable

alternatives usually need to be explained." (quoting Bando Chem. Indus., Ltd. v. United States, 16

CIT 133, 136, 787 F. Supp. 224, 227 (1992), aff'd, 26 F.3d 139 (Fed. Cir. 1994))).

     ArcelorMittal also contends that Commerce's selected rate was not in accordance with law

because the rate was not sufficiently adverse to Severstal to effectuate the statute's dual purposes:

(1) ensuring that the respondent does not benefit from its non-cooperation by receiving a more

favorable rate than it otherwise would have and (2) deterring future non-cooperation by

respondents.  ArcelorMittal Br. at 32, 34–35; see SAA, 1994 U.S.C.C.A.N. at 4199; Nan Ya

Plastics Corp. v. United States, 810 F.3d 1333, 1347–48 (Fed. Cir. 2016).  ArcelorMittal asserts

that Commerce may not use its discretion to select an AFA rate which is insufficiently adverse to

achieve the statutory objectives.  ArcelorMittal Reply Br. at 8; see IPSCO, Inc. v. United States

899 F.2d 1192, 1195 (Fed. Cir. 1990).  Additionally, the statute provides Commerce with

discretion to rely on record information (but not necessarily the hierarchy) to apply the highest rate

possible to effectuate the purposes of the statute.  ArcelorMittal Br. at 31; see 19 U.S.C. §

1677e(b)(2), (d)(2).  ArcelorMittal also cites to prior Commerce determinations to demonstrate

that it regularly deviates from its AFA hierarchy to ensure that its selected AFA rate is sufficiently

adverse to the non-cooperative party,[10] and contends that Commerce had a "legal obligation" to

do so here.  See ArcelorMittal Br. at 30–32.

---

[10] Issues and Decision Memorandum for the Final Determination in the Countervailing Duty
Investigation of Truck and Bus Tires from the People's Republic of China; and Final Affirmative
Determination of Critical Circumstances, in Part at 14 (Dep't Commerce Jan. 19 2017); Decision
Memorandum for Final Results of Countervailing Duty Administrative Review; Certain Oil

With respect to the first statutory purpose of ensuring the respondent does not benefit, ArcelorMittal asserts, based on purported relative size of their respective mining operations, that Severstal's mining-exploration expense deductions must have been much higher than NLMK's. Id. at 32–34.  Consequently, ArcelorMittal argues, applying NLMK's rate is more beneficial to Severstal than the rate that would have been applied if Severstal had cooperated, in contravention of one of the statutory purposes.  Id.  With respect to the second statutory purpose of deterrence, in ArcelorMittal's view, the selected AFA rate was too low to serve as a deterrent against future non-cooperation, in part because it produced a perverse outcome: Severstal (the uncooperative party) received a *de minimis* overall CVD rate for, while NLMK (which was cooperative) received an affirmative CVD rate.  See id. at 32.  Altogether, according to ArcelorMittal, Commerce's decision was contrary to law because it improperly used its discretion to select an AFA rate for Severstal that was insufficiently adverse to satisfy either of the statute's purposes.

The Court first considers whether Commerce adequately explained its decision to rely on step one of its AFA hierarchy, and whether the subsequent steps were "potentially acceptable alternatives."  See Altx, 167 F. Supp. 2d at 1361; Asociacion Colombiana de Exportadores de Flores v. United States, 22 CIT 1174, 1176, 704 F. Supp. 1068, 1071 (1998).  "While Commerce must explain the bases for its decision, 'its explanations do not have to be perfect.'"  Taian Ziyang Food Co., Ltd. v. United States, 37 CIT ___, ___, 918 F. Supp. 2d 1345, 1354 (2013) (quoting NMB Singapore Ltd. v. United States, 557 F.3d 1316, 1319 (Fed. Cir. 2009)).  Still, "'the path of Commerce's decision must be reasonably discernable' to support judicial review."  Id. at 1354 (quoting NMB Singapore, 557 F.3d at 1319).  ArcelorMittal cites no authority requiring

---

Country Tubular Goods from the People's Republic of China at 23–24 (Dep't Commerce Aug. 25, 2014).

Commerce to provide an explanation for not relying on the hierarchy's subsequent steps even though the first step was applicable.  Therefore, Commerce's explanation, limited to the first step of the AFA hierarchy on which it based its selected rate, was sufficient.

The Court next considers whether Commerce's application of NLMK's program-specific rate to Severstal was sufficiently adverse to ensure Severstal did not benefit from its non-cooperation, and to deter future non-cooperation.  The SAA expressly sets forth that "one factor [Commerce] will consider is the extent to which a party may benefit from its own lack of cooperation."  SAA, 1994 U.S.C.C.A.N. at 4199.  As the Federal Circuit has recognized, the statute's "expectation" is that Commerce's selected AFA rate will have a deterrent effect.[11]  See Nan Ya Plastics, 810 F.3d at 1348.  Here, ArcelorMittal's assertion that Severstal benefitted from Commerce's application of NLMK's program-specific rate, because it produced a lower rate than would have been applied had Severstal cooperated, is speculative.  While facts on the record do establish the disparity between the size of Severstal's and NLMK's respective mining operations, ArcelorMittal fails to show that necessarily means Severstal's mining-exploration deductions under the program during the period of investigation were resultantly larger.  Under the statute, Commerce is not required to infer that there was necessarily a connection between the relative size of Severstal's mining operations and the larger size of its deductions under the program.  See 19 U.S.C. § 1677e(b)(1)(B), (d)(3).

---

[11] This view is also supported by Commerce's own prior determinations. See Issues and Decision Memorandum for Final Results of Antidumping Duty Administrative Review: Certain Circular Welded Non-Alloy Steel Pipe from Mexico at cmt 4 (Dep't Commerce June 13, 2011), ref'd in 76 Fed. Reg. 36,086 (Dep't Commerce June 21, 2011) (final results) ("The Department has a duty to both ensure that uncooperative parties do not benefit from their lack of cooperation and to encourage their future compliance." (citing Final Determination of Sales at Less than Fair Value: Static Random Access Memory Semiconductors from Taiwan, 63 Fed. Reg. 8,909, 8932 (Dep't Commerce Feb. 23, 1998)) (citation omitted)).

The Court determines, however, that Commerce's justification does not adequately explain why the application of NLMK's program-specific rate was sufficiently adverse to deter future non-cooperation.  First, the Government argues that the selected AFA rate is higher than the rate that would have been applied pursuant to Severstal's initial claim of non-usage.  See Government Br. at 23.  However, this justification is essentially an assertion that Commerce's selected rate is sufficiently adverse because it is above 0% -- the rate that is applied when a respondent truly has not utilized the program at issue.  Moreover, Severstal's claim of non-usage was proven to be false at verification, which is the reason Commerce is resorting to AFA.  It was unreasonable for Commerce to use Severstal's demonstrably false non-usage claim as a basis for what rate is sufficiently adverse to Severstal.  Commerce's contention that "a difference between a finding of use and non-use is adverse" does not adequately remedy this deficiency.

Second, the Government notes that Commerce's selected rate is significantly higher than the rate Commerce assigned Severstal for the program in its Preliminary Determination.  See Government Br. at 23.  However, Commerce acknowledged in its Final Determination that it had inadvertently relied on the incorrect data in performing this calculation for its Preliminary Determination.  See IDM at 122–23.  Using the value set in its Preliminary Determination as a benchmark for measuring the adversity of the selected rate to Severstal was arbitrary, given that the value was admittedly incorrect based on an administrative error.  Id.  Because both of the benchmarks Commerce used to justify the adversity of its selected AFA rate to Severstal were unreasonable, the Court remands this issue so that Commerce may provide a more satisfactory explanation as to why NLMK's program-specific rate is sufficiently adverse to deter future non-cooperation.

Finally, the Court considers ArcelorMittal's contention that Commerce was legally obligated to deviate from its hierarchy in this case in order to fulfill the purpose of the statute. The statute's provision on adverse inferences consistently uses permissive language to describe how Commerce may go about applying AFA. See 19 U.S.C. § 1677e(b), (d). Commerce thus has wide latitude in its selection of an appropriate AFA rate. However, Commerce's discretion is not without limit. The Federal Circuit in IPSCO, 899 F.2d at 1195, noted that a Court cannot uphold an agency's "exercise of administrative discretion if it contravenes statutory objectives." In other words, Commerce has discretion to select an AFA rate by any means permissible under the statute, so long as the rate it produces does not contravene the purposes of the statute. Furthermore, ArcelorMittal identifies no authority that requires Commerce to consider the aggregate effect on a company's overall subsidy rate in selecting AFA for a particular program-specific rate. Consequently, whether or not Severstal's overall rate is affirmative or *de minimis* does not necessarily affect whether the program-specific rate it selects is sufficiently adverse. Therefore, on remand Commerce is not obligated to deviate from its AFA hierarchy or produce a program-specific rate that necessarily results in an affirmative overall rate, but it must provide adequate explanation as to why the program-specific rate it selected was sufficiently adverse to satisfy the underlying statutory purposes. If it cannot do so, it must select another rate that can be justified under the statute's purposes.[12]

------

[12] In order to provide Commerce with further clarity as it performs the remand, the Court addresses ArcelorMittal's argument that Commerce's rejection of line 040 as the basis for Severstal's use of the mining-exploration expenses tax deduction program ("the program") was not supported by substantial evidence. See ArcelorMittal Br. at 23. ArcelorMittal criticizes as speculative Commerce's finding that using line 040 would "overstate[] the benefit" to Severstal under the program, asserting that Commerce properly declined to accept information about the sub-breakouts of line 040 at verification and thus lacked any record evidence to its overstatement conclusion. ArcelorMittal Br. at 21–24; see, e.g., Marsan Gida Sanayi ve Ticaret A.S. v. United States, 37 CIT ___, ___, 931 F. Supp. 2d 1258, 1280 (2013) (agreeing that the "purpose of

II.   **Commerce's Determination That The GOR's Alleged Provision Of Natural Gas For Less Than Adequate Remuneration Is Specific To Steel Manufacturing Is Not Supported By Substantial Evidence And In Accordance With Law.**

    a.   The GOR Did Not Verify The Information Necessary For Commerce To Make Its Specificity Determination.

NLMK acknowledges that the Gazprom annual reports were "necessary information" for Commerce's specificity determination, because they provided the natural gas consumption percentages by various industries in the Russia. See NLMK Br. at 13–14. The only contested issue is whether the reports are verifiable. Id. NLMK asserts that the GOR sufficiently verified

---

verification is not to collect new information"). ArcelorMittal further notes this Court's holding that, in selecting an AFA rate, there must be a "built in increase" over a respondent's actual rate in order to deter uncooperative behavior. ArcelorMittal Reply Br. at 15 (citing China Steel Corp. v. United States, 28 CIT 38, 61, 306 F. Supp. 2d 1291, 1311 (2004)). Thus, according to ArcelorMittal, Commerce's decision to reject line 040 as AFA is contrary to the law's requirement to include a "built in increase" as a response to Severstal's uncooperative behavior. Id.

    The Court determines that Commerce's finding that line 040 would overstate the benefit of the program is supported by substantial evidence. Substantial evidence is "more than a mere scintilla," but "less than the weight of the evidence." Altx, 370 F.3d at 1116. "A finding is supported by substantial evidence if a reasonable mind might accept the evidence as sufficient to support the finding." Maverick Tube Corp. v. United States, 857 F.3d 1353, 1359 (Fed. Cir. 2017) (citing Consol. Edison Co. of N.Y. v. NLRB, 305 U.S. 197, 229 (1938)). Despite the fact that the values of each category of expense under line 040 are not on the record, a reasonable mind could conclude that using the line 040 value -- which aggregates the values of each sub-breakout expense category -- would overstate the amount Severstal deducted under the program, given that most of the sub-breakout expense categories would not qualify for deduction under the program. See Severstal Verification Report at 6–7 (listing 11 entries under the breakout for line 040). No evidence in the record suggests that the values of the non-deductible expense categories under line 040 equal zero. Commerce's decision to reject line 040 as inappropriate for AFA was also reasonable and in accordance with law. The statute at 19 U.S.C. § 1677e(b)(1) and (d)(3) expressly discusses adjustments and information that Commerce is not required to consider in selecting AFA, but does not mandate that Commerce consider any particular information in its selection. Moreover, prior decisions of this Court and the Federal Circuit demonstrate that Commerce has significant discretion in its selection of appropriate AFA. See PAM S.p.A v. United States, 582 F.3d 1336, 1340 (Fed. Cir. 2009); SolarWorld Ams., Inc. v. United States, 41 CIT ___, ___, 229 F. Supp. 3d 1362, 1366 (2017). Commerce thus reasonably concluded that using line 040 would "overstate the benefit" of the program to Severstal, and would be contrary to Commerce's responsibility to select AFA that does not unreasonably overestimate the actual usage rate.

the annual reports by (1) presenting original copies of the reports (2) making available Gazprom officials who could attest to the authenticity of the original reports and (3) providing a blank authentic quarterly sales report form to demonstrate the statistical categories used to build the annual reports were the same as those presented in the annual reports.  Id. at 14.  According to NLMK, these steps were sufficient because there was no more granular set of statistical data than that presented in the annual reports, so they adequately verify the statistical categories used in the data, which NLMK claims is the focus of Commerce's specificity analysis.[13]  See id. Consequently, the completed quarterly sales reports could offer no further insights into these statistical categories, and so Commerce need not have looked at them.  See NLMK Br. at 14. Additionally, NLMK argues that it was inappropriate for Commerce to find the annual reports untrustworthy for its specificity finding, but rely on them for its market distortion and benefit/benchmark finding.  See NLMK Br. at 16.  Therefore, NLMK contends that Commerce's decision to find the necessary information unverifiable, and consequently apply AFA, was not supported by substantial evidence because, for the reasons stated above, the records were verifiable.  Id.

The Government argues that NLMK misunderstands the issue at hand.  According to the Government, the real issue is not whether the statistical categories match between the quarterly sales forms and the annual reports, but whether the GOR provided the underlying data necessary to verify that the consumption percentages between them match.  See Government Br. at 32–33.

---

[13] NLMK attempts to support this proposition by citing to a prior determination it claims shows that Commerce's key consideration in such investigations is to confirm that the statistical categories produced for verification are those used in everyday business.  NLMK Br. at 15; Live Swine from Canada: Final Negative Countervailing Duty Determination, 70 Fed. Reg. 12,186 (Dep't Commerce Mar. 11, 2005) and accompanying Issues and Decision Memorandum at 11–14.

The very purpose of verification is to "verify the accuracy and completeness of submitted factual information." 19 C.F.R. § 351.307(d); <u>see</u> Government Br. at 33.  Commerce has wide latitude in selecting its verification procedures.  See <u>Micron Tech., Inc. v. United States</u>, 117 F.3d 1386, 1396 (Fed. Cir. 1997).  Therefore, the Government argues, Commerce cannot take for granted that just because the names of the general statistical categories match, the percentages of sales across the categories in the annual reports were also verified.  <u>Id.</u> at 32.  Essentially, because the GOR did not provide the underlying data necessary -- in the form of the completed quarterly sales reports -- Commerce could not verify the consumption percentages in the annual reports, and was thus justified in applying AFA to come to its *de facto* specificity finding.  <u>Id.</u> at 33.

Additionally, the Government asserts that Commerce was justified in finding the Gazprom annual report unreliable for its specificity finding but still using evidence from the report for its benefit/benchmark finding.  <u>See</u> Government Br. at 37.  The Government contends that the fact that Commerce could not verify the consumption percentages in one discrete section of the annual report does not make the entire report unreliable, since there was nothing that else that put the validity of the rest of the report into question.  <u>Id.</u>  As a result, Commerce was not precluded from relying on other parts of the annual report for its benefit/benchmark determination.  <u>Id.</u>

The Court concludes that because the GOR did not provide information at verification that would allow Commerce to verify the underlying data used to produce the values of the natural gas consumption percentages in the Gazprom annual reports, Commerce was justified in applying AFA for its *de facto* specificity finding.  The presentation of authentic original versions of the annual reports, along with Gazprom officials to verify their authenticity, does not prove the consumption percentages were indeed accurate.  These materials simply demonstrate that the consumption percentages found in the copies of the annual reports sent to Commerce in the GOR's

questionnaire responses had not been altered from the values listed in the original annual report. However, this does nothing to verify the accuracy of the consumption percentage values in the original annual reports.  In addition, the GOR's provision of blank quarterly sales forms does nothing to verify the accuracy of the values found in the annual reports, because this blank form, by definition, contains no underlying data.  Thus, because the GOR refused to allow Commerce verification officials to view the completed quarterly sales form -- the only known documents that could verify the accuracy of the annual report consumption percentages -- on the grounds that they were "confidential," the Consumption percentages were not verified.  See GOR Verification Report at 4.

      b.   <u>Commerce's Finding That The GOR Failed To Cooperate By Not Acting To The Best Of Its Ability Was Supported By Substantial Evidence And In Accordance With Law.</u>

NLMK argues that Commerce's guidance in its verification outline did not clearly identify the types of documents the GOR needed to produce at verification, so the GOR reasonably believed that it was acting to the "best of its ability" by producing the materials that it did.  NLMK Br. at 18, 20.  NLMK claims that "nowhere in the outline are actual sales data expressly required."  <u>Id.</u> at 20.  NLMK advances two arguments for why the GOR was reasonable in believing that it was in compliance with Commerce's requests to verify the accuracy and completeness of the consumption percentages in the Gazprom annual reports.  <u>Id.</u> at 20–23.  First, the character of the information at issue is "self-authenticating" because the Gazprom annual reports are published by "a publicly traded company subject to securities laws, which were not prepared for the purposes of the CVD proceeding."  <u>Id.</u> at 21.  Therefore, it was reasonable for the GOR to expect that the veracity of this document would not be challenged beyond the four corners of the report, consistent with prior Commerce determinations which effectively presume the accuracy of such documents.

See id. at 21–22.[14]   Second, the GOR could reasonably rely on Commerce's past practice in *de*

*facto* specificity determinations to expect that the materials it produced were adequate since they

demonstrated the statistical categories in the annual reports were those "used in the everyday

course of business."   Id. at 23; see Live Swine from Canada: Final Negative Countervailing Duty

Determination, 70 Fed. Reg. 12,186 (Dep't Commerce Mar. 11, 2005) and accompanying Issues

and Decision Memorandum at 11–14; Live Cattle from Canada: Preliminary Negative

Countervailing Duty Determination, 64 Fed. Reg. 25,277, 25,279 (Dep't Commerce May 11,

1999).   Thus, providing the completed quarterly forms would have done nothing more to prove

that the statistical categories in the annual reports were the ones used in the course of everyday

business.   See supra at pp. 24–26 (discussing materials provided by GOR that allegedly verified

statistical categories used in annual report); NLMK Br. at 25.   For the reasons stated above, NLMK

contends that Commerce unreasonably found that the verification outline clearly reflected

Commerce's intention to examine actual Gazprom sales data outside the context of that presented

in the annual reports.   Therefore, in NLMK's view, the GOR acted to "the best of its ability" to

comply with the requests made in Commerce's verification outline by providing the materials it

did in line with its reasonable interpretation of the instructions.

The Court first considers whether the GOR acted to "the best of its ability" in responding

to Commerce's verification instructions.   As noted above, "[c]ompliance with the 'best of its

ability' standard is determined by assessing whether respondent has put forth its maximum effort

to provide Commerce with full and complete answers to all inquiries in an investigation."   Nippon

---

[14] See, e.g., Countervailing Duty Investigation of Certain Amorphous Silica Fabric From the People's Republic of China: Preliminary Determination of the Countervailing Duty Investigation and Alignment of Final Determination With Final Antidumping Duty Investigation, 81 Fed. Reg. 43,579 (Dep't Commerce July 5, 2016) and accompanying Issues and Decision Memorandum at 21–25.

Steel, 337 F.3d at 1382.  "While the standard does not require perfection and recognizes that mistakes sometimes occur, it does not condone inattentiveness, carelessness, or inadequate record-keeping."  Id.

Whether the GOR acted "to the best of its ability" rests on two distinct but related questions.  First, the Court must determine whether Commerce's verification outline instructions were clear enough that it was unreasonable for the GOR to believe the materials it produced at verification were adequate.  Commerce's verification instructions explicitly state: "Have available the supporting records (such as, print-outs from Gazprom's database or sales reports) which were used to build-up the annual sales data and to compute the percentages reported" on the 2012–2014 Gazprom annual reports.  See GOR Verification Outline at 4 (emphasis added); IDM at 49.  The Oxford English Dictionary defines "compute" as "to calculate."  Compute, OXFORD ENGLISH DICTIONARY (3d ed. 2008).  This definition implies that there must be numerical values included in any materials used to "compute" the reported percentages.  Thus, materials such as the blank quarterly sales forms, by definition, cannot reasonably be said to be used to compute the reported percentages because they do not include any numbers from which to do so.  These instructions, in combination with additional instructions in the verification outline were clear enough that the GOR should have known it needed to provide the completed quarterly sales reports, to which the GOR expressly denied Commerce verifiers access.  See id. at 39; see also IDM at 49; GOR Verification Report at 7.  Given the word choice and specificity of the instructions, NLMK cannot reasonably assert that the GOR "reasonably interpreted" these instructions as not requiring the provision of the completed quarterly sales reports.  Altogether, the GOR did not act to the "best of its ability" in this regard.

Second, the Court considers whether the Gazprom annual reports were self-authenticating. According to NLMK, if the Gazprom annual reports were self-authenticating by their very nature as audited financial documents, then the GOR was reasonable in believing that it need not provide any underlying data, in the form of completed quarterly sales reports, in response to Commerce's verification instructions.  See NLMK Br. at 21.  NLMK argues that it is contrary to Commerce's practice to look behind data in audited financial statements because Commerce regards them as "the touchstone for accuracy."  Id. at 22.  NLMK attempts to support this proposition by citing to Geum Poong v. United States, 26 CIT 322, 325, 193 F. Supp. 2d 1363, 1367 (2002), which it asserts establishes that Commerce considers audited financial statements to be "self-verifying."  In that case, the Court quoted a Commerce request for additional information from the respondent, in which Commerce "indicated that 'any information submitted must be credible and self-verifying, e.g. audited financial statements . . . .'"  Id.  However, in the very next sentence, the Court pointed out that Commerce  "could have requested still more information if it considered the submission somehow incomplete."  Id.  Despite NLMK's assertion to the contrary, this language demonstrates that Geum Poong stands for the proposition that Commerce is broadly entitled to ask for additional information from respondents if it feels that the materials provided were not sufficient to verify the facts placed on the record, regardless of Commerce's characterization of the facial reliability of such documents.  This is precisely what Commerce did in the instant case, and the GOR expressly refused to provide the additional materials requested by Commerce (i.e., the completed quarterly sales forms) on the grounds that they were "confidential." Therefore, Gazprom's annual reports were not "self-authenticating," and as such it was unreasonable for the GOR to believe it did not need to produce the underlying quarterly sales data in response to Commerce's instructions.

NLMK further argues that the GOR's response to the Commerce verification team's request for information was merely deficient, requiring Commerce to give notice and an opportunity for remedy which Commerce did not provide.  NLMK Br. at 26–27.  The statute, 19 U.S.C. § 1677m(d), requires Commerce to give a cooperating party an opportunity to remedy or explain deficiencies in its submissions before it may use AFA.  NLMK Br. at 26; see 19 U.S.C. § 1677m(d).  According to NLMK, if Commerce wanted the GOR to produce more materials than what the GOR could have reasonably expected from the verification instructions, and was prepared to invoke AFA if the GOR did not comply, the GOR was entitled to some notice and opportunity to remedy the submissions that Commerce found inadequate.  NLMK Br. at 27.

"Nothing in the statute compels Commerce to treat intentionally incomplete data as a 'deficiency' and then to give a party that has intentionally submitted incomplete data an opportunity to 'remedy' as well as to 'explain.'"  Papierfabrik August Koehler SE v. United States, 843 F.3d 1373, 1384 (Fed. Cir. 2016).  In the instant case, Commerce specifically requested the quarterly sales forms in its verification outline instructions.  It is unreasonable for NLMK to argue that the completed quarterly sales forms were not "sales reports" used to "compute the annual consumption percentages" per Commerce's instructions.   See supra pp. 28.   Furthermore, Commerce again specifically asked for the quarterly sales reports at verification, and the GOR informed Commerce in no uncertain terms that it would not be able to provide those materials because they were "confidential."  NLMK's arguments related to notice and opportunity to remedy under 19 U.S.C. § 1677m(d) are unpersuasive, since it cannot be argued that the GOR's response was "merely deficient" if the instructions were unambiguous as to what was expected of it.

c. <u>Commerce's Affirmative Specificity Finding Was Not Supported By Substantial Evidence.</u>

NLMK argues that Commerce's *de facto* specificity determination was not based on any facts on the record.  <u>See</u> NLMK Br. at 28.  NLMK points out that Commerce does not cite to anything in the record in its *de facto* specificity finding.  <u>See id.</u>; <u>IDM</u> at 16, 50.  NLMK asserts that when Commerce "simply reaches an adverse conclusion without any resort to facts on the record, that conclusion cannot be said to be supported by substantial evidence."  NLMK Br. at 28; <u>See</u> <u>Changzhou Trina Solar Energy Co., Ltd. et al. v. United States</u>, 40 CIT ___, ___, 195 F. Supp. 3d 1334, 1350 (2016).

The Government argues that Commerce's determination that the GOR's provision of natural gas was *de facto* specific was supported by substantial evidence, even though Commerce did not cite any record facts to support that determination.  First, the Government contends that <u>Changzhou Trina</u>'s holding is not binding on this Court and outlines several reasons why it disagrees with the decision.  <u>See</u> Government Br. at 42; <u>Algoma Steel Corp. v. United States</u>, 865 F.2d 240, 243 (Fed. Cir. 1989).  The Government then argues that regardless of <u>Changzhou Trina</u>, Commerce's *de facto* specificity finding was based on "facts" on the record.  Government Br. at 43.  Per the Government, although Commerce's finding was not accompanied by a specific record citation, the "procedural history, and the inferences flowing therefrom, are themselves 'facts' supporting this determination."  <u>Id.</u> at 43–44.  Moreover, the Government asserts that Commerce's finding is consistent with "the culmination of Commerce's analysis of the Gazprom 2014 annual report in the preliminary determination," and with Commerce's decision to initiate the investigation.  <u>Id.</u> at 44.  Instead of Commerce's *de facto* specificity finding being based on verified evidence in the final determination, which is not required for an AFA determination, Commerce

declined to reward the GOR for its non-cooperation and found that the "facts" supported a finding of *de facto* specificity.  Id.

The Court determines that Commerce did not fulfil its obligation to support its *de facto* specificity finding with any record evidence.  The AFA statute lists four potential sources of information on which Commerce may rely when making adverse inferences: (1) the petition, (2) a final determination in the investigation under this title, (3) any previous review under 19 U.S.C. § 1675 or determination under § 1675b, or (4) any other information placed on the record.  See 19 U.S.C. § 1677e(b)(2).  Although this list provides Commerce wide latitude in selecting facts upon which to base its adverse inference, it is clear it must be based upon record evidence.

Changzhou Trina is an analogous case reinforcing this proposition.  In that case, Commerce resorted to AFA after the respondent and the Government of China were both uncooperative in helping Commerce identify countervailable programs used by the respondent.  See Changzhou Trina, 195 F. Supp. 3d at 1343–45.  As a result, Commerce found the government grants it discovered the respondent had used to be *de facto* specific and therefore countervailable.  See id. at 1347.  Commerce's Final Determination in that case did not cite to any facts that it relied upon in finding that the programs at issue were *de facto* specific.  Id. at 1347–48.  Instead, Commerce's finding was "a sweeping legal conclusion lacking any factual foundation."  Id. at 1349.  The Court held that because Commerce "improperly reached legal conclusions without the support of requisite factual findings, the agency's determination . . . must be remanded for reconsideration."  Id. at 1350.

In the instant case, Commerce provided no citation to any facts whatsoever -- on the record or otherwise -- in its finding that the GOR's provision of natural gas was *de facto* specific.  See IDM at 16, 50.  Commerce essentially rested its specificity finding on the proposition that because

it may use an adverse inference, it therefore may find the GOR's provision of natural gas was *de facto* specific.  Id.  Such a statement is the type of "sweeping legal conclusion" the Changzhou Trina Court held to be inadequate under the statute.  As noted, the Government attempts to justify Commerce's lack of citation to any record facts by arguing that the "procedural history, and the inferences flowing therefrom, are themselves 'facts' supporting this determination."  Government Br. at 43–44.  However, the government provides no authority to support this proposition, or explain why it satisfies the statutory standard.  Because both the statute's language and prior decisions of this Court are clear that Commerce must rely on some actual record fact in applying adverse inferences, the Court remands Commerce's determination so that the agency may identify record facts on which it bases its *de facto* specificity finding.[15]

## III.    Severstal Can Raise Arguments Related To Commerce's Application Of AFA In Its Defendant-Intervenor Brief.

As noted above, the Government filed a motion to strike arguments advanced by Severstal in its defendant-intervenor brief that pertain to whether Commerce was correct in resorting to AFA in determining Severstal's CVD rate.  The Government asserts Severstal is now improperly raising arguments that support its cross-claim, which the Court previously dismissed for lack of standing.  See id. at 3–5; see also ArcelorMittal, 222 F. Supp. 3d 1293.  Severstal argues that it is appropriate to raise such arguments in its defendant-intervenor brief, because they are merely rebutting "the various arguments and factual assertions in Plaintiff's opening brief, which claims that Severstal failed to report certain tax benefits and that the Department therefore properly relied on [AFA]."

_____

[15] The issues raised by the parties pertaining to the benchmark Commerce selected to measure the adequacy of NLMK's remunerations for the GOR's provision of natural gas are predicated on Commerce appropriately finding that the GOR's provision of natural gas for LTAR was *de facto* specific.  Therefore, until Commerce can sufficiently justify its *de facto* specificity finding, the Court will not address those issues.

Resp. to Mot. to Strike at 3, Dec. 20, 2017, ECF No. 82.  Furthermore, Severstal contends that it

can bring such arguments in its brief without running afoul of the Court's prior rulings because

those pertained to whether Severstal had standing for a cross-claim, which this is not.  Id. at 4–5.

Under the Court's rules, it "may strike from a pleading an insufficient defense or any

redundant, immaterial, impertinent, or scandalous matter."  USCIT R. 12(f).  However, motions

to strike constitute extraordinary remedies, and "should be granted only in cases where there has

been a flagrant disregard of the rules of court."  Jimlar Corp. v. United States, 10 CIT 671, 673,

647 F. Supp. 932, 934 (1986) (citing Application of Harrington, 55 CCPA 1459, 1462, 392 F.2d

653, 655 (1968)).  The party's brief must demonstrate "a lack of good faith, or that the court would

be prejudiced or misled by the inclusion in the brief of the improper material."  Jimlar, 647 F.

Supp. at 934; see also Fla. Tomato Exch. v. United States, 38 CIT ___, ___, 973 F. Supp. 2d 1334,

1338 (2014).

In its order granting the Government's motion to dismiss, the Court expressly ruled that

Severstal's argument that Commerce should not have resorted to AFA did not impermissibly

expand the issues in dispute because it is encompassed within the primary issue in this case:

"whether the AFA rate assigned to Severstal is supported by substantial evidence and in

accordance with law."  Given this characterization of the issue, Severstal's inclusion of this

argument in its brief does not meet the high standard of "flagrant disregard" of the court's rules to

justify striking it from the brief.

**IV.**     **Commerce's Application Of AFA To Severstal Was Appropriate.**

Severstal argues that Commerce failed to meet the legal requirements of the statute's AFA

and related provisions, and was wrong, as a factual matter, that Severstal failed to report its use of

the program.  Severstal Br. at 12–22.  In essence, Severstal contends that it was inappropriate for

Commerce to resort to AFA on the grounds that Severstal did not disclose its use of the program, because Severstal did disclose its use of the program. See id. at 12–19. As such, Severstal claims that Commerce's finding that it "failed to act to the best of its ability" was not supported by substantial evidence. See id. Accordingly, Severstal asserts that Commerce should have calculated a program rate based on the same methodology that it used in its Preliminary Determination. See id. at 10, 22, 28–29.

Severstal's claims that it disclosed its use of the program are incorrect. In Severstal's initial questionnaire response, it unequivocally claimed that "it did not receive any benefits under the tax deduction for exploration costs." Severstal's IQR at 23. Furthermore, Severstal's supplemental questionnaire response directed Commerce to line 054 of Severstal's tax return, which did not include any amount for exploration-related deductions, only R&D expenses deductions -- a separate program. See Severstal's Pre-Preliminary Comments at 10; IDM at 123–24. Moreover, Severstal did not respond to Commerce's direct question regarding exploration expense deduction usage, only its extraction tax deduction. See id. at S-11, S-13.[16] Commerce only discovered the actual expenses related to Severstal's use of the program at verification, when it observed the relevant values under line 040 of Severstal's tax return that "did not trace to any of the deduction amounts previously reported by the Severstal Companies." IDM at 123. Based on the standard described supra, these facts demonstrate that Severstal did not comply with Commerce's requests about the program to "the best of its ability," and thus Commerce was justified in resorting to AFA to determine Severstal's subsidy rate under the program.

---

[16] Commerce's question was "Did the company deduct any exploration expenses or take a reduction of its extraction taxes on the company's 2013 tax returns?"

## <u>CONCLUSION</u>

Commerce's selected AFA rate for Severstal for the program was contrary to law because it did not adequately explain why the rate it selected was sufficient to deter future non-cooperation, as the statute and binding case precedent require.  The Court thus remands the <u>Final Determination</u> so that Commerce may either provide a satisfactory explanation as to why its selected AFA rate was sufficiently adverse to satisfy the statute's purpose, or select another rate which does comport with the statute's purpose of deterrence in accordance with the guidance laid out in this opinion.

Regarding NLMK, the consumption percentages in the Gazprom annual reports were not verified by the materials produced by the GOR at verification, and thus the GOR did not act to "the best of its ability."  Commerce was therefore warranted in applying AFA.  However, even though Commerce's decision to apply AFA was appropriate, its *de facto* specificity finding was still improper because it did not provide any specific factual basis for its conclusion. Consequently, the Court remands the <u>Final Determination</u> so that Commerce may identify the record facts it relied upon in making its *de facto* specificity determination.

Commerce shall file with the Court and provide to the parties the results of its redetermination on remand within 90 days of the date of this order; thereafter, the parties shall have 30 days to submit briefs addressing the redetermination to the Court and the parties shall have 15 days thereafter to file reply briefs with the Court.

**SO ORDERED.**

/s/      *Gary S. Katzmann*
    Gary S. Katzmann, Judge

Dated: <u>September 19, 2018</u>
    New York, New York